McKAY, Circuit Judge.
In this case, we are called upon to review a final order of the Occupational Safety and Health Review Commission finding a serious violation of a safety regulation and assessing a $5,500 penalty against Petitioner Compass Environmental. Specifically, the Commission held that Compass violated 29 C.F.R. § 1926.21(b)(2) by failing to train a now-deceased employee to recognize and avoid the electrocution hazard presented by a high-voltage overhead power line at his worksite in Fort Lupton, Colorado. In its petition for review, Compass argues that the Commission failed to apply the correct legal test and erred in concluding that a reasonably prudent employer would have anticipated this employee’s potential exposure to the power line.
BACKGROUND
In early 2006, Compass began construction on an underground slurry wall at a surface mine site in Fort Lupton, Colorado. As part of this project, a mobile excavator with a 75-foot boom was used to dig a trench for the slurry wall. The two-man excavator crew consisted of the excavator operator and a trench hand, whose responsibilities included checking the trench depth, greasing the excavator, and watching for problems with the excavator that the operator could not see. When the trench hand greased the excavator, he would hold a grease line — a rubber and metal hose with a metal nozzle for dispensing grease — which was connected to the excavator. He performed this work after each cut by the excavator, generally at the same time other maintenance, including refueling, was performed.
The trench hand was a new employee who joined the team one week into the project. During the first week of the project, Compass prepared Job Safety Analyses and instructed employees on the hazards identified therein. The Job Safety Analysis specific to the excavator operator and trench hand identified various hazards associated with the trench excavation, including the hazard posed by the energized power line that crossed over one end of the construction site. According to the Job Safety Analysis, the excavator operator and trench hand were to be instructed to maintain a “20 ft. clearance between [the excavator and] overhead lines.” (R. at 19533.) However, because of the trench hand’s later start date, he was not present during the training on this Job Safety Analysis. Moreover, while he was given individual safety training, this training did not include any instructions on the overhead power line.
This power line crossed one end of the construction site at a maximum height of 34 feet above the ground. The 7,200-volt line was being used to power the electrical pump at the surface mine’s gravel pit, and thus the mine owner wanted to keep it energized as long as possible. When the digging began to approach the power line in the middle of March 2006, Compass informed the mine owner that the line would soon need to be de-energized and removed so Compass could move its equipment into this area. The line was still energized, however, on March 18, 2006, when the excavator reached a point less than two hundred feet from the overhead line.
*1167 Compass had given no specific instructions to employees on how or where to refuel the excavator, but Compass managers testified that the excavator was always refueled in the same way. At the end of the work day, the operator would move the excavator about twenty or thirty feet away from the trench onto more stable ground and then wait for a portable 300-gallon fuel tank to be brought to the excavator by a forklift. Although there was no policy against doing so, Compass managers testified that prior to March 18, 2006, the operator never moved the excavator off its compacted dirt work pad or did anything except wait for the forklift to bring the fuel tank to the excavator.
On March 18, however, the excavator operator decided not to call for the forklift to bring the portable fuel tank to him. Instead, he moved the excavator off of the work pad and walked it towards the fuel tank, which the forklift, operator had left beneath the energized power line. The trench hand walked beside the excavator with the excavator’s grease line in his hand, and the boom was extended so the trench hand could reach it with the grease gun. Unfortunately, when the excavator came near the fuel tank, its 75-foot boom came close enough to the power line for an electric current to pass from the line to the excavator and then through the grease line to the trench hand, killing him.
Following an investigation, the Secretary of Labor issued Compass a two-item serious citation for failing to adequately train the operator and trench hand and for failing to maintain proper clearance of the power line. The citation was challenged by Compass and vacated by an administrative law judge who held, inter alia, that the trench hand’s exposure to the energized power line was not foreseeable. The Secretary of Labor petitioned the Occupational Safety and Health Review Commission for review of the ALJ’s dismissal of the training violation as it pertained to the trench hand. On review, the Commission concluded that a reasonably prudent employer would have anticipated the trench hand’s exposure to the overhead power line and provided him with training addressing this electrocution hazard. The Commission therefore reversed the ALJ’s vacatur of this portion of the citation and assessed a penalty of $5,500. Compass then filed this petition for review.
DISCUSSION
We review the Commission’s factual findings under a substantial evidence standard, which is satisfied if “ ‘a reasonable mind’ would consider the evidence adequate to support the conclusion reached.” Universal Constr. Co. v. Occupational Safety & Health Review Comm’n, 182 F.3d 726, 732 (10th Cir.1999). We review the Commission’s legal conclusions “to determine if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” Id. Our review under this standard is narrow and highly deferential to the agency. Id.
The first issue we must consider is whether the Commission used the correct legal test to determine whether the Secretary proved a violation of 29 C.F.R. § 1926.21(b)(2), which provides:
each employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.
Compass argues that an OSHA violation can only be established through application of the four-part test set forth in Secretary v. Atlantic Battery Co., 16 BNA OSHC 2131, 2138 (1994), and several other Commission cases. Under this test, to estab *1168 lish a violation of an occupational safety or health standard, the Secretary must prove “(a) the applicability of the cited standard, (b) the employer’s noncompliance with the standard’s terms, (c) employee access to the violative conditions, and (d) the employer’s actual or constructive knowledge of the violation (i.e., the employer either knew, or with the exercise of reasonable diligence could have known, of the violative conditions).” Id. In this case, rather than applying this generic four-part test, the Commission applied a more training-specific test and focused on the issue of whether a reasonably prudent employer would have anticipated the trench hand’s exposure to the overhead power lines and provided him with training on this hazard. See N & N Contractors, Inc., 18 BNA OSHC 2121, 2125 (No. 96-0606, 2000) (“To establish noncompliance with a training standard, the Secretary must show that the cited employer failed to provide the instructions that a reasonably prudent employer would have given in the same circumstances.”).
We are not persuaded that the Commission erred in focusing its inquiry on this question. Nothing in the pertinent statutes or regulations mandates application of the four-part Atlantic Battery test for an alleged § 1926.21(b)(2) violation, nor has Compass pointed us to any binding precedent that so requires. We note this is not the first case in which the Commission has foregone the generic four-part test in favor of a more specific test for training violations. See, e.g., Capform, Inc., 19 BNA OSHC 1374 (No. 99-0322, 2001); Baker Tank Co., 17 BNA OSHC 1177 (No. 90-1786, 1995). Indeed, the generic test, while appropriate for many types of OSHA violations, has proven ill-fitted in determining whether the § 1926.21(b)(2) training standard has been violated. The fourth prong of this test — employer knowledge of the violative condition — -will almost invariably be present where the alleged violative condition is inadequate training of employees. See, e.g., Andrew Elec. Co., 22 BNA OSHC 1593 (No. 08-0103, 2009) (ALJ) (“The standard at 29 C.F.R. § 1926.21(b)(2) addresses safety training, so the employer necessarily knows whether or not it instructed each employee in the recognition and avoidance of unsafe conditions.... ”); Lane Constr. Corp., 23 BNA OSHC 1097 (No. 09-0348, 2009) (ALJ) (“As the employer, Lane had actual knowledge of its training program.”). As for the third prong — employee access to the violative condition — this factor is inapplicable on its face in the context of § 1926.21(b)(2), where the violative condition is inadequate or nonexistent training. It is nonsensical to ask whether an employee had access to a lack of training. Even where adjudicators have stretched the language of the test to ask instead whether employees had access to a hazard that training should have warned against, this prong has not proven very useful. See, e.g., Andrew Elec., 22 BNA OSHC 1593 (concluding that an employee was necessarily exposed to a hazardous condition because this hazardous condition caused his death).
Moreover, even under the training-specific test applied by the Commission in this case, an employer will not be found to have committed a training violation unless it “failed to provide the instructions that a reasonably prudent employer would have given in the same circumstances.” El Paso Crane & Rigging Co., 16 BNA OSHC 1419, 1424 (No. 90-1106, 1993). An employer’s obligation to train is accordingly “dependent upon the specific conditions [at the worksite], whether those conditions create a hazard, and whether the employer or its industry has recognized the hazard.” W.G. Fairfield Co., 19 BNA OSHC 1233, 1236 (99-0344, 2000). “Employees must *1169 be given instructions on ‘(1) how to recognize and avoid the unsafe conditions which they may encounter on the job, and (2) the regulations applicable to those hazardous conditions.’ ” Capform, 19 BNA OSHC at 1376 (quoting Superior Custom Cabinet Co., 18 BNA OSHC 1019, 1020 (No. 94-200, 1997)). Thus, the Commission’s training-specific test is not untethered to the specific conditions in the workplace and the particular hazards to which employees may be exposed. This test simply considers these factors through an approach better tailored for this particular context than the generic Atlantic Battery test. We see no error in the Commission’s use of a training-specific test to assess whether Compass violated § 1926.21(b)(2).[1]
Having so decided, we next consider whether the Commission erred in its application of this training-specific analysis to the facts of the instant case. To prove a violation of the training standard, the Secretary was required to prove that Compass failed to provide the instructions that a reasonably prudent employer would have given in the same circumstances. See El Paso Crane, 16 BNA OSHC at 1424. These circumstances include “the specific conditions [at the worksite], whether those conditions create a hazard, and whether the employer or its industry has recognized the hazard.” W.G. Fairfield Co., 19 BNA OSHC at 1236. Here, the overall worksite included high-voltage power lines, which posed a severe hazard to any employee who might contact them in some way. Moreover, the employer recognized this hazard — particularly as it applied to the trench hand and excavator operator— and trained most of its employees at the worksite on safety measures to take near overhead lines. Compass now argues, however, that this training was unnecessary and does not prove that a reasonably prudent employer would have trained the trench hand on this hazard as well.
We are not persuaded by this argument. An employer’s identification of and training on a specific hazard is certainly relevant to the question of whether a reasonably prudent employer would have provided training on this hazard. Cf. Cape & Vineyard Div. v. Occupational Safety & Health Review Comm’n, 512 F.2d 1148, 1154 (1st Cir.1975) (“The company’s own safety rules certainly may be treated as evidence of its awareness of the hazard which caused Thayer’s death.”).[2] Moreover, Compass recognized this hazard as being particularly applicable to the excavator operator and trench hand, and this recognition, in combination with the train *1170 ing provided to the operator and other employees, is sufficient to support the Commission’s conclusion that a reasonably prudent employer would have trained the trench hand on this hazard. Nor does it seem unduly burdensome to require an employer to train its employees on a known severe hazard at a mobile construction worksite where unanticipated contingencies may arise. “One purpose of the Act is to prevent the first accident.” Lee Way Motor Freight, Inc. v. Secretary of Labor, 511 F.2d 864, 870 (10th Cir.1975).
Although Compass might not have been able to predict the manner in which the trench hand would be exposed to this hazard, we conclude that the Commission did not abuse its discretion in holding that Compass should have trained the trench hand on the fatal danger posed by the high-voltage lines located in the vicinity of his work area. Because it is undisputed that Compass did not give this employee any instructions on this hazard, we see no abuse of discretion in the Commission’s conclusion that Compass violated § 1926.21(b)(2).
CONCLUSION
The Commission’s decision is AFFIRMED.

. In so holding, we do not mean to suggest that the four Atlantic Battery prongs are all irrelevant to a training violation. A violation of § 1926.21(b)(2) cannot be found where, for instance, the standard is inapplicable. And the second Atlantic Battery prong will necessarily be satisfied if the Secretary shows noncompliance under the training-specific test. The Commission was not required, however, to recite the mantra of the four-part Atlantic Battery test in order to evaluate the relevant factors in the instant case.

. As the dissent notes, the court in Cape ultimately reversed the finding of a violation, holding that the company safety rule at issue in that case was insufficient to prove that the company failed to follow reasonably prudent practices. The court reached this conclusion because the relevant company rule — a general requirement to wear “sufficient'' protective covering while working “close to live wires” — was far too general and broadly phrased to prove that a reasonably prudent employer would have required the specific additional safety measures asserted by the Secretary. Cape, 512 F.2d at 1154. In this case, by contrast, Compass identified this specific position for training about this particular electrical hazard. Thus, Compass’s job safety analysis constituted clear evidence regarding the key issue in this case — whether a reasonably prudent employer would have trained the trench hand on this hazard.