**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 28, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAKE'S FIREWORKS INC.,

       Petitioner,

v.

R. ALEXANDER ACOSTA,
SECRETARY OF LABOR, UNITED
STATES DEPARTMENT OF LABOR,

       Respondent.

No. 17-9536

_____

**Petition for Review of an Order from the**
**Occupational Safety and Health Review Commission**
**(OSHRC No. 15-0260)**
_____

Eric W. Clawson, Jake's Fireworks, Inc., Pittsburg, Kansas (Michael A. McCabe, Jake's Fireworks, Inc., Pittsburg, Kansas and Michael Baker, Munck Wilson Mandala, LLP, Dallas, Texas, with him on the briefs), for Petitioner.

Ronald J. Gottlieb, Senior Trial Attorney (Nicholas C. Geale, Acting Solicitor of Labor, Ann S. Rosenthal, Associate Solicitor for Occupational Safety and Health, and Heather R. Phillips, Counsel for Appellate Litigation, with him on the brief), United States Department of Labor, Washington, D.C., for Respondent.

_____

Before **MATHESON**, **PHILLIPS**, and **MCHUGH** Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Jake's Fireworks, Inc. ("Jake's"), a fireworks importer and distributor, assigned two employees to clean out its old facility. A fire broke out, injuring one employee and killing the other. After an Occupational Safety and Health Administration ("OSHA") inspection, the Secretary of Labor (the "Secretary") cited Jake's for violating OSHA safety and health standards. Jake's contested the citation before an Occupational Safety and Health Review Commission ("OSHRC") Administrative Law Judge ("ALJ"), who affirmed in full. Jake's sought review from the OSHRC's discretionary review panel (the "Commission"), but it declined, finalizing the ALJ's decision. Jake's then filed a petition in this court, contesting violations of (1) 29 C.F.R. § 1910.109(b)(1), improper storage and handling of explosives; (2) 29 C.F.R. § 1910.178(c)(2)(vii), improper use of a liquid-propane ("LP") forklift around combustible dust; and (3) 29 C.F.R. § 1910.1200(e)(1), lack of a written hazard communication program.

Exercising jurisdiction under 29 U.S.C. § 660(a), we affirm and deny the petition to review.

## I. BACKGROUND

### A. *Factual Background*

Jake's imports fireworks from China, packages them in trays with launch tubes, and sells them as kits to customers.

### 1. The Old Facility Fire

Until November 2012, Jake's stored fireworks at 689 South 69 Highway in Pittsburg, Kansas (the "Old Facility"). The Old Facility had two warehouses and several

2

hundred fireworks storage containers. When Jake's received a shipment from China, it unloaded the fireworks into its storage containers.

In November 2012, Jake's moved to its current facility at 1500 East 27th Street Terrace (the "New Facility"). Although it moved its operation and most supplies, Jake's left storage containers filled with fireworks, trays, and packaging materials at the Old Facility. During the next 19 months, Jake's intermittently cleaned the Old Facility with the goal of renting it out.

Finally, in August 2014, Jake's initiated a "major project" to clean out the Old Facility for a new tenant. ROA at 170-71. Scott Moutz, Jake's production supervisor, assigned Jake's employees Howard Harper and Kenny Clark to clean the Old Facility. Mr. Moutz assigned them to unload the shipping containers, which contained items such as fireworks and packaging materials.

On August 12, 2014, Mr. Harper and Mr. Clark began unloading a bunker filled with Excaliburs, a type of firework that "make[s] a very loud noise and pretty color." *Id.* at 124, 125. Using a LP forklift, Mr. Clark lifted pallets stacked with boxes of fireworks while Mr. Harper stood beside the pallet to steady the load. Around 2:35 p.m., a flash fire engulfed the storage container that they were cleaning. Mr. Harper later testified that before the fire, "the only thing [he] remember[ed]" was the forklift "going underneath that pallet to pick it up and . . . [seeing] a bright light, a spark." *Id.* at 137. Both men suffered severe burns. Mr. Clark died.

3

## 2. **Investigations and Issuance of the Citation**

### a. *Fire Investigator Michael Tippie's investigation*

On the day of the fire, Fire Investigator Michael Tippie of the Kansas State Fire Marshal's Office investigated the scene and the surrounding worksite. He took photographs, recorded observations, and conducted interviews. He did not collect dust samples.

At the accident scene, Fire Investigator Tippie observed the "heavily damaged" storage container. *Id.* at 51. Fire had consumed most of it. Fireworks—with varying degrees of damage—and debris were strewn around and inside the container where the forklift was located. He examined the LP forklift, which had been lifting a pallet. Underneath and around the forklift, he noticed "many, many, many remnants" of consumer fireworks. *Id.* at 63-64. The forklift's liquid propane tank had exploded during the fire. Its left fork sat atop a nail protruding from a steel plate in the storage container.

In the surrounding worksite, Fire Investigator Tippie noticed that other storage containers were similar to the one involved in the accident. He observed that "[t]hey were unswept and just littered with debris." *Id.* at 66. In one container, he "saw a large pile of damaged unpackaged fireworks just pushed up into one corner." *Id.* Finally, he noticed that there were consumer fireworks—both damaged and undamaged—scattered around and on the loading dock area.

4

b. *Compliance Safety and Health Officer Ryan Hodge's investigation and issuance of citation*

The next day, OSHA dispatched Compliance Safety and Health Officer ("CSHO") Ryan Hodge to investigate. Like Fire Investigator Tippie, he took photos, interviewed individuals, and noted his observations. He also did not collect dust samples.

CSHO Hodge toured the site with Fire Investigator Tippie, consulted with him about the accident, and photographed the scene. He noted the storage container's steel metal plate, fireworks in various states of damage, debris in piles, and broken fireworks on the loading dock. He determined the two men used a LP forklift. He observed vegetation around the storage containers and learned that rodents had chewed through some of the packages of fireworks in the containers.

He learned from Mr. Moutz that the Old Facility "had essentially been disregarded since the move." *Id.* at 262. He also discovered from an employee that Jake's did not have a written hazard communication program, an OSHA requirement for employers to document the hazardous materials on the worksite premises.

CSHO Hodge concluded that "[t]he metal plate may have been contacted by a portion of the forklift at some time, which then would have resulted in a spark, which may have been the source of ignition." *Id.* at 219.

After his visit to the site, CSHO Hodge reviewed the evidence, requested additional information, and consulted the relevant safety standards. Based on CSHO Hodge's findings and recommendation, the Secretary issued a Citation and Notification

5

of Penalty to Jake's, charging ten safety and health standard violations.[1]  The three

violations challenged in this appeal were for violating 29 C.F.R.:

> (1) § 1910.109(b)(1), improper storing and handling of
> explosives,
>
> (2) § 1910.178(c)(2)(vii), improper use of a LP forklift
> around combustible dust, and
>
> (3) § 1910.1200(e)(1), lack of a written hazard
> communication program.

### B.  *Relevant Safety and Health Standards and Proving a Violation*

We provide an overview of the three OSHA safety and health standards that

govern this case and the four elements the Secretary must show to prove a violation of a

safety and health standard.

### 1.  **The Three Safety and Health Standards**

Congress passed the Occupational Safety and Health Act (the "Act") to ensure

"safe and healthful working conditions" for "every working man and woman in the

Nation."  29 U.S.C. § 651(b).  To that end, the Secretary "may by rule promulgate,

modify, or revoke any occupational safety or health standard."  *Id*. § 655(b).[2]

---

[1] The Secretary issued the citation to Lone Star Management, LLC.  Lone Star's affiliates include Jake's.

[2] The Act broadly defines "employer" as "a person engaged in a business affecting commerce who has employees."  29 U.S.C. § 652(5).  This includes "any commercial or noncommercial activity affecting commerce and involving the employment of one or more employees."  29 C.F.R. § 1975.3(d); *see also* J. Larry Stine et al., *Occupational Safety and Health Law: Compliance and Practice* § 3.2 (2017).  Jake's does not contest that it is an "employer" under the Act.

a. *29 C.F.R. § 1910.109(b)(1) - storing and handling of explosives*

Title 29 C.F.R. § 1910.109(b)(1) provides that "[n]o person shall store, handle, or transport explosives or blasting agents when such storage, handling, and transportation of explosives or blasting agents constitutes an undue hazard to life." "Explosives" encompass all materials "which [are] classified as Class A, Class B, and Class C explosives by the U.S. Department of Transportation." 29 C.F.R. § 1910.109(a)(3).[3] These materials "include[], but [are] not limited to . . . black powder." *Id.* (listing examples of explosive materials). Section 1910.109(b)(1) "applies to the manufacture, keeping, having, storage, sale, transportation, and use of explosives, blasting agents, and pyrotechnics." *Id.* § 1910.109(k)(1).

b. *29 C.F.R. § 1910.178(c)(2)(vii) - use of designated trucks around combustible dust*

Title 29 C.F.R. § 1910.178 "contains safety requirements relating to fire protection, design, maintenance, and use" of certain motorized industrial trucks. *Id.* § 1910.178(a)(1). It lists "eleven different designations of industrial trucks" based on how the trucks are powered—e.g., electric, diesel, or gasoline—and based on their safety features—e.g., fire safeguards. *Id.* § 1910.178(b).

---

[3] The Department of Transportation no longer uses the Class A, B, and C classifications. It now classifies fireworks like Jake's—which would have been Class C explosives—as 1.4G explosives. *See* 49 C.F.R. § 173.53. Jake's agrees that it imports, stores, and distributes 1.4G explosives.

7

The Secretary cited Jake's under § 1910.178(c)(2)(vii), which requires employers to use only three types of trucks—DY, EE, or EX—in the presence of combustible dust.[4] The standard applies when ignitable deposits or accumulations of combustible dust are present. *Id*. § 1910.178(c)(2)(vii). In working environments where (1) deposits or accumulations of combustible dust (2) may be ignited by arcs or sparks originating in the truck, (3) the employer must use a DY, EE, or EX truck. *Id.* These are diesel and electric powered trucks that have certain safeguards against fire. *See id*. § 1910.178(b)(3), (6), and (7).

c. *29 C.F.R. § 1910.1200(e)(1) - hazard communication program*

Title 29 C.F.R. § 1910.1200 requires employers to have a written program that "ensure[s] that the hazards of all chemicals . . . are classified" and "that information concerning the classified hazards is transmitted to employers and employees." *Id.* § 1910.1200(a)(1). It "requires chemical manufacturers or importers to classify the hazards of chemicals which they produce or import." *Id*. § 1910.1200(b)(1). Further, employers must have "labels and other forms of warning, safety data sheets, and

_____

[4] The standard reads in full:

> Only approved power-operated industrial trucks designated as DY, EE, or EX shall be used in atmospheres in which combustible dust will not normally be in suspension in the air or will not be likely to be thrown into suspension by the normal operation of equipment or apparatus in quantities sufficient to produce explosive or ignitable mixtures but where deposits or accumulations of such dust may be ignited by arcs or sparks originating in the truck.

29 C.F.R. § 1910.178(c)(2)(vii).

employee information and training" concerning the hazardous chemicals. *Id.*

§ 1910.1200(e)(1).

Employers handling certain types of materials are exempt from this requirement. As relevant here, 29 C.F.R. § 1910.1200 does not apply to employers who handle "articles." *Id*. § 1910.1200(b)(6)(v).[5]

2. **Establishing a Safety and Health Standard Violation**

Section 5(a)(2) of the Act requires that "employers shall comply with occupational safety and health standards promulgated under this chapter." 29 U.S.C. § 654(a)(2). Violations are classified as de minimis, *id*. § 658(a); other-than-serious, *id*. § 666(c); serious, *id.* § 666(k); repeat, *id.* § 666(a); or willful, *id.* Of the three violations on appeal, the Secretary classified Jake's violations of § 1910.109(b)(1) and § 1910.178(c)(2)(vii) as serious and its violation of § 1910.1200(e)(1) as other-than-serious. Jake's does not dispute these classifications.

---

[5] An article is a manufactured item other than a fluid or particle:

> (i) which is formed to a specific shape or design during manufacture;
>
> (ii) which has end use function(s) dependent in whole or in part upon its shape or design during end use; and
>
> (iii) which under normal conditions of use does not release more than very small quantities, e.g., minute or trace amounts of a hazardous chemical (as determined under paragraph (d) of this section), and does not pose a physical hazard or health risk to employees.

29 C.F.R. § 1910.1200(c) (paragraph breaks added).

Generally, to establish a safety and health standard violation, the Secretary must demonstrate by a preponderance of the evidence:

> (1) the applicability of the standard,
>
> (2) the employer's noncompliance with the terms of the standard,
>
> (3) employee access to the violative condition, and
>
> (4) the employer's actual or constructive knowledge of the violation.

*Atlantic Battery Co.*, 16 BNA OSHC 2131, at \*6 (No. 90-1747, 1994); *see also Sanderson Farms, Inc. v. Perez*, 811 F.3d 730, 735 (5th Cir. 2016).

## C. *Procedural History*

After it received the citation, Jake's submitted a notice of contest, triggering the Secretary's duty to file a complaint before the OSHRC. *See* 29 C.F.R. § 2200.34. The Secretary filed a complaint containing the citation, and Jake's filed an answer.[6] The parties submitted briefs for a trial before an OSHRC ALJ. On the three violations raised in this appeal, Jake's argued that:

> (1) § 1910.109(b)(1) is void for vagueness and the Secretary could not prove a violation;
>
> (2) § 1910.178(c)(2)(vii) requires testing of combustible dust and because CSHO Hodge failed to test, the Secretary could not and did not prove a violation; and
>
> (3) § 1910.1200(e)(1) does not apply because Jake's fireworks were "articles," exempting it from the hazard communication program requirement.

---

[6] OSHA amended its complaint to reduce the number of violations and the total proposed penalty amount to $24,000. The three issues on appeal still appeared therein.

10

At trial, Fire Investigator Tippie, CSHO Hodge, Mr. Harper, and Mr. Moutz testified.[7]

The ALJ "affirmed" all the violations, but reduced Jake's penalty to $20,000.

*Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *23 (No. 15-0260, 2017) (ALJ). She

held:

> (1) § 1910.109(b)(1) is not vague and the Secretary proved that Jake's storage and handling of explosives was an undue hazard to life;
>
> (2) The Secretary proved a violation of § 1910.178(c)(2)(vii)—regardless of any combustible testing requirement—because sufficient evidence showed the dust was combustible and that Jake's used a truck other than a DY, EE, or EX truck around it; and
>
> (3) The Secretary proved a violation of § 1910.1200(e)(1) because Jake's was not exempt and the Secretary proved that it lacked a hazard communication program.

*Id*. at *6-12, *16-18, *19-22. Jake's appealed to the Commission, which declined review.

The ALJ's decision thereby became final. *See* 29 U.S.C. § 661(j). Jake's next filed a

petition for review in this court.

## II. **DISCUSSION**

The following addresses (A) our standard of review and (B) our review of the

ALJ's decisions on the three violations.

### A. *Standard of Review*

We review the ALJ's factual findings under a substantial evidence standard, which

is satisfied if "'a reasonable mind' would consider the evidence adequate to support the

---

[7] All witnesses testified to the facts laid out in the Factual Background. We describe their testimony in greater detail where relevant to our discussion.

conclusion reached." *Universal Constr. Co. v. OSHRC,* 182 F.3d 726, 732 (10th Cir. 1999). We review the ALJ's legal conclusions "to determine if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*[8]

"Our review under this standard is narrow and highly deferential to the agency." *Compass Envtl., Inc. v. OSHRC*, 663 F.3d 1164, 1167 (10th Cir. 2011). As for factual findings, we do not reweigh the evidence, second-guess the factual inferences drawn therefrom, or substitute our judgment on the credibility of witnesses. *See Tierdael Constr. Co. v. OSHRC*, 340 F.3d 1110, 1114 (10th Cir. 2003).

## B. *The Three Violations*

Jake's challenges the ALJ's affirmance of three violations. We affirm the ALJ's decision and deny the petition to review.

## 1. **Section 1910.109(b)(1) - Storing and Handling of Explosives Violation**

The ALJ determined that § 1910.109(b)(1) is (1) not unconstitutionally vague and (2) that the Secretary met his burden to show Jake's storage and handling of explosives presented an undue hazard to its employees. As to the latter, the ALJ concluded that Jake's (1) storing damaged consumer fireworks, (2) leaving explosive powder on the floor of storage containers, (3) allowing grass and brush near the storage containers, and (4) keeping fireworks in cracked storage containers "contributed to a fire and explosion

---

[8] When, as here, the Commission has declined to review an ALJ's decision, we review the ALJ decision as we would a Commission decision. *Safeway, Inc. v. OSHRC*, 382 F.3d 1189, 1193 (10th Cir. 2004).

hazard which presented an undue hazard to life." *Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *11.

On appeal, Jake's argues that § 1910.109(b)(1) is void for vagueness and, even if it is not, the Secretary has failed to prove a violation because Jake's neither violated the standard—the second element of the four-part test to prove a violation—nor did it possess actual or constructive knowledge of the hazardous conditions—the fourth element. We disagree.

a. *Section 1910.109(b)(1) not void for vagueness*

i. Additional legal background

"[A]n administrative regulation which is so vague that persons of common intelligence must necessarily 'guess at its meaning' violates due process." *Vandehoef v. Nat'l Transp. Safety Bd.*, 850 F.2d 629, 630 (10th Cir. 1988).

We examine the challenged regulation as applied. Because "[w]e are considering a regulation promulgated pursuant to remedial civil legislation," *Brennan v. OSHRC*, 505 F.2d 869, 872 (10th Cir. 1974), "we do not view the language of the statute as an abstraction or apply it in hypothetical fact situations," *Austin Bldg. Co. v. OSHRC*, 647 F.2d 1063, 1066 (10th Cir. 1981). Instead, we consider the regulation "in the light of the conduct to which it is applied." *Brennan*, 505 F.2d at 872 (quotations omitted). [9] The Commission has said that a standard is clear if "a reasonable person responsible for the safety of employees, after considering the standard . . . and the factual situation, would be

---

[9] We consider facial challenges to statutes or regulations that impose criminal penalties or may inhibit First Amendment rights. *See Brennan*, 505 F.2d at 872.

able to apply the language of the standard to the situation in order to identify the hazard and eliminate it." *Brown & Root, Inc.*, 9 BNA OSHC ¶ 1833, at *8 (No. 76-190, 1981) (alteration in original) (quotations omitted).

ii. Analysis

Section 1910.109(b)(1) is clear and unambiguous as applied here and does not violate due process. It provides that "[n]o person shall store, handle, or transport explosives or blasting agents when such storage, handling, and transportation of explosives or blasting agents constitutes an undue hazard to life." 29 C.F.R. § 1910.109(b)(1).

Jake's arguments address the standard on its face. It contends that "when" and "storage, handling, and transportation . . . [constituting] an undue hazard to life" are ambiguous.[10] It further argues that the standard "fails to state . . . under what conditions the storage, handling, or transportation of explosives constitutes an undue hazard to life." Aplt. Br. at 23 (alterations and quotations omitted). We disagree.

First, even under a facial analysis, the standard "delineates its reach in words of common understanding." *Brennan*, 505 F.2d at 872 (quotation omitted). Whenever "storage, handling, [or] transportation" constitutes an "undue hazard to life," the employer has violated the standard. For the standard to be clear, it need not spell out all

---

[10] Jake's argues *Culberson Well Serv., Inc.*, 12 BNA OSHC ¶ 1535 (No. 85-0139 1985) (ALJ), held § 1910.109(b)(1) to be unconstitutional for these reasons and the Secretary therefore, cannot enforce the regulation. But because it was an ALJ decision, *Culberson* is not precedential. When a decision "lack[s] full Commission review," it "does not constitute precedent binding upon us." *Leone Constr. Co.,* 3 BNA OSHC ¶ 1979, at *2 (No. 4090, 1976).

14

situations where activity is hazardous. Second, and more pertinent here, the standard is clear in light of the conduct to which it was applied. A reasonable person responsible for employee safety would have understood the storage and handling of explosives in the Old Facility created an undue hazard. The danger of ignition from the black gunpowder and broken fireworks that littered the Old Facility constituted a hazard for employees.

b. *The Secretary proved a violation of § 1910.109(b)(1)*

Under the substantial evidence standard of review, we find the Secretary marshalled sufficient evidence to show that Jake's improper storage and handling of fireworks constituted an undue hazard to life and violated the standard.

On appeal, Jake's challenges the second and fourth elements of the four-part test: whether the Secretary demonstrated Jake's (2) violated the standard or (4) had actual or constructive knowledge of the violation.[11]

i. Noncompliance with the undue hazard standard

The ALJ found that Jake's violated the standard because its storage and handling of fireworks at the Old Facility were an undue hazard. *Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *11. CSHO Hodge and Fire Investigator Tippie testified that the Old Facility's conditions—damaged fireworks, spilled gunpowder, overgrown vegetation, and combustible debris—"contributed to a fire and explosion hazard which presented an

_____

[11] Jake's presented a different argument about the second element before the ALJ, *see, e.g.*, ROA at 1268, but we address his argument on appeal because he properly preserved it in his Petition for Discretionary Review to the Commission, *id*. at 1548; *see also* 29 U.S.C. § 660(a); *P. Gioioso & Sons, Inc. v. OSHRC*, 115 F.3d 100, 104-07 (1st Cir. 1997) (examining the Petition for Discretionary Review to determine the issues properly preserved on appeal).

15

undue hazard to life." *Id.* Moreover, the ALJ concluded that the resulting accident also supported the finding. *Id.* at *11 n.9.

For substantially the same reasons, we affirm the ALJ's determination. "[A] reasonable mind would consider the evidence adequate to support [the ALJ's] conclusion." *Universal Constr. Co.*, 182 F.3d at 732 (quotations omitted). Both CSHO Hodge and Fire Investigator Tippie testified about the Old Facility's unkempt state. *See, e.g.*, ROA at 223, 245, 248-49. They also explained how these conditions created an undue hazard. CSHO Hodge, for example, explained how the brush accumulations and debris were "excessive combustibles," which "may serve as a fuel source for [a potential] fire and allow the fire to continue to grow, leading to potential serious injuries to employees . . . ." *Id.* at 261-62. The resulting fire was probative that Jake's storage and handling of fireworks was in fact a hazard. *Ralston Purina Co.*, 7 BNA OSHC ¶ 1302, at *3 (No. 76-2551, 1979) ("[T]he occurrence of and circumstances surrounding an accident may be probative evidence of a violation."). In sum, the Old Facility's conditions, CSHO Hodge's and Fire Investigator Tippie's testimony, and the resulting fire support the ALJ's conclusion that Jake's storage and handling constituted an undue hazard.[12]

---

[12] On appeal, Jake's argues that the ALJ did not make a "proper finding establishing and identifying an undue hazard." Aplt. Br. at 26. It contends that (1) the witnesses' testimony that the conditions presented an undue hazard "provided no analysis," *id.* at 25; (2) finding an undue hazard requires the "violat[ion of] an applicable industry safety standard," *id.* at 24; and (3) the ALJ's order "simply agree[d] with the witnesses" without further analysis, *id.* at 25. But the record and the ALJ's order demonstrate otherwise.

ii. Actual or constructive knowledge

The ALJ found that Jake's possessed (1) actual and (2) constructive knowledge. *Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *12. First, she determined that Mr. Moutz's testimony showed he was aware of the Old Facility's unkempt conditions. *Id.* Second, she determined that Jake's should have known about the conditions: its "knowledge of the contents of the containers, their location, and the length of time it had been since any housekeeping had occurred at the" Old Facility made it constructively aware of the dangerous conditions. *Id.* (citing *Central Florida Equip. Rentals, Inc.*, 25 BNA OSHC ¶ 2147 (No. 08-1656, 2016)).

For substantially the same reasons, we affirm the ALJ's determination. "[A] reasonable mind would consider the evidence adequate to support [the ALJ's] conclusion." *Universal Constr. Co.*, 182 F.3d at 732 (quotations omitted). Mr. Moutz's testimony provided adequate evidence that Jake's possessed actual and constructive knowledge.

First, Mr. Moutz, a Jake's supervisor, testified that, before the fire occurred, he had an opportunity to observe the contents of the container that Mr. Clark and Mr. Harper

First, the witnesses did provide analysis. As quoted above, CSHO Hodge, for example, explained how the brush accumulations and debris were "excessive combustibles." ROA at 261-62. Second, Jake's does not cite any authority that "an undue hazard" requires the violation of an applicable industry safety standard. Even so, Fire Investigator Tippie discussed how Jake's failed to comply with the National Fire Protection Association 1124, a document providing national standards for the storage of fireworks. *See id.* at 109-12. Third, in addition to acknowledging the witnesses' testimony, the ALJ considered evidence of the Old Facility's condition and the resulting accident to conclude that Jake's handling and storage of fireworks constituted an undue hazard. Jake's argument that it was not cited for a housekeeping violation is inadequately developed to show how this relates to the § 1910.109(b)(1) citation.

17

worked in on the day of the fire. It is reasonable to infer that he saw the damaged

fireworks, debris, and vegetation before the fire and possessed actual knowledge of the

hazardous circumstances. Second, he testified that the Old Facility was "out-of-sight,

out-of-mind" and there was no housekeeping program at it once Jake's moved to the New

Facility. ROA at 168, 170. He said the Old Facility was "never like that" when Jake's

operated out of it, but instead "was clean." *Id.* at 168. This testimony showed Jake's

knew or should have known the Old Facility was not safe. Because "[t]he actual or

constructive knowledge of a foreman . . . can be imputed to the employer," *Tampa

Shipyards Inc*., 15 BNA OSHC ¶ 1533, at *6 (Nos. 86-360, 86-469, 1992), substantial

evidence supported the ALJ's determination.

Jake's argues it "had good reason to believe that the work conditions . . .

presented no undue hazard to life" because it had "a long history of performing the same

tasks in the same manner without similar accidents." Aplt. Br. at 27. But "the Secretary

need not show that an employer understood or acknowledged that the physical conditions

were actually hazardous." *Boh Bros. Constr. Co.*, *LLC*, 24 BNA OSHC ¶ 1067, at *8

(No. 09-1072, 2013) (quotations omitted). Instead, as the Secretary has done here, he

must show only that the employer was aware that "the physical conditions that constitute

a violation" existed. *Id.* (quotations omitted).

\* \* \* \*

We affirm the ALJ's conclusions that §1901.109(b)(1) is not unconstitutionally

vague and that the Secretary proved Jake's violation.

18

2. **Section 1910.178(c)(2)(vii) - Designated Trucks Violation**

The ALJ determined that the Secretary met his burden to prove that Jake's violated § 1910.178(c)(2)(vii) when it failed to use a DY, EE, or EX truck around accumulations of combustible dust. *Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *18. She also said that "testing [of the combustible dust] was unnecessary" to find a violation. *Id.* at *17.

On appeal, Jake's argues that OSHA Compliance Directive CPL 03-00-008 (the "Combustible Dust Directive" or the "Directive") requires testing of combustible dust to find a violation under § 1910.178(c)(2)(vii). Because no testing occurred here, Jake's contends the ALJ lacked sufficient evidence to find noncompliance with the standard— the second element of the four-part test to establish a violation. We disagree and affirm the ALJ's decision.

We first provide additional background on the interpretation of OSHA safety and health standards, the Combustible Dust Directive, and the nature of agency policy statements. We then turn to our analysis of whether we should affirm the ALJ's ruling that Jake's violated § 1910.178(c)(2)(vii). We conclude (1) the designated trucks standard—§ 1910.178(c)(2)(vii)—does not require dust testing to establish a violation, (2) the Directive is a policy statement that guides OSHA inspectors but does not prescribe requirements for the agency to find a safety standard violation, and (3) the ALJ's ruling should be affirmed under the substantial evidence standard.

a. *Additional background*

i. Interpretation of OSHA safety and health standards

When interpreting federal regulations, "we apply the same rules we use to interpret statutes." *Mitchell v. Comm'r*, 775 F.3d 1243, 1249 (10th Cir. 2015). "We begin by examining the plain language of the text, giving each word its ordinary and customary meaning." *Id.*

A regulation is "ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways." *See Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1226 (10th Cir. 2014) (quotations and citations omitted). "The plainness or ambiguity of [regulatory] language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the [regulation] as a whole." *See id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "If, after engaging in this textual analysis, the meaning of the regulations is clear, our analysis is at an end, and we must enforce the regulations in accordance with their plain meaning." *Mitchell*, 775 F.3d at 1249.

ii. The Combustible Dust Directive

The Combustible Dust Directive is one of OSHA's National Emphasis Programs ("NEPs"). In general, NEPs are agency documents that "focus [OSHA's] outreach efforts and inspections on specific hazards in the workplace." Mark A. Rothstein, *Occupational Safety & Health Law* § 10:5 (2018). They often identify a particular hazard, such as combustible dust or lead; provide a method for determining what

workplaces may have the hazard; and offer detailed guidance for CSHOs to investigate the hazard. *See, e.g.*, OSHA, CPL 03-00-009, *National Emphasis Program - Lead* (2008). OSHA currently lists nine NEPs on its website. *See* OSHA, Directives – NEP, https://perma.cc/C3AH-LQ2K (listing Combustible Dust, Federal Agencies, Hazardous Machinery, Hexavalent Chromium, Lead, Primary Metal Industries, Process Safety Management, Shipbreaking, and Trenching & Excavation NEPs).

OSHA issued the Combustible Dust Directive in 2007 and updated it in 2008. *See* OSHA, CPL 03-00-008, *Combustible Dust National Emphasis Program (Reissued)* (2008) [hereinafter Combustible Dust Directive]. After an "accident involving a combustible dust explosion at a sugar refinery, OSHA [] decided to intensify its focus on this hazard [of combustible dust]." *Id.* at Abstract-3. The Directive "focus[ed] [enforcement activities] on specific industry groups that have experienced either frequent combustible dust incidents or combustible dust incidents with catastrophic consequences." *Id*.

The Directive "contains policies and procedures for [CSHOs] inspecting workplaces that handle combustible dusts that are likely to cause dust deflagrations, other fires, or explosions." *Id.* at 1. It lists conditions that a CSHO "should be able to recognize . . . [as] indicat[ing] that a potential dust deflagration, other fire, or explosion hazard exists." *Id.* at 11. These include a plant's history of fires, Material Safety Data Sheets ("MSDS"),[13] and dust accumulations. *Id.* at 11-12. When a CSHO

---

[13] MSDS catalog information about the composition of chemicals on site.

21

> find[s] that there are potential combustible dust hazards, dust samples must be safely collected. . . . Dust samples shall be submitted to OSHA's Salt Lake Technical Center (SLTC) for analysis.

*Id*. at 12. The Directive lists § 1910.178(c)(2)(vii)—the designated trucks standard at issue here—as a basis for a potential citation that CSHOs may issue after finding combustible dust. *Id*. at 21.

### iii. Policy statements

Section 553(b)(A) of the Administrative Procedure Act exempts "general statements of policy" from notice and comment rulemaking. 5 U.S.C. § 553(b)(A). Policy statements are "merely public pronouncements of the policy that the agency plans to follow . . . ." *AMREP Corp. v. FTC*, 768 F.2d 1171, 1178 (10th Cir. 1985). They "do[] not seek to impose or elaborate or interpret a legal norm," but "merely represent[] an agency position with respect to how it will treat—typically enforce—the governing legal norm." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach." *Id.* Policy statements include but are not limited to "guidances, manuals, circulars, memoranda, [and] bulletins." Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like-Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L.J. 1311, 1315 (1992).

Agency policy statements are generally not binding on courts in reviewing agency actions, on parties in enforcement proceedings, or the agency itself in establishing a violation. *See US Magnesium, LLC v. EPA,* 690 F.3d 1157, 1168 (10th Cir. 2012); *Rapp*

22

*v. U.S. Dep't of Treasury*, 52 F.3d 1510, 1522 (10th Cir. 1995); *AMREP Corp.*, 768 F.2d at 1178; *see also* Charles Koch, Jr. & Richard Murphy, 1 *Administrative Law & Practice* § 4:22 (3d ed. 2018); Richard J. Pierce, Jr., 1 *Administrative Law Treatise* § 6:3 at 419 (5th ed. 2010).

Policy statements differ from legislative rules, which agencies promulgate through notice and comment and have the "force and effect of law." *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979). Unlike legislative rules, policy statements "do[] not establish a 'binding norm'"—or in other words, do not have the force and effect of law. *Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1263 (10th Cir. 1982) (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)). Policy statements do not compel courts to "give [them] binding effect under step two of *Chevron*" deference. *S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 828 (10th Cir. 2000). They generally cannot be enforced against parties, *see Am. Mining Cong.*, 671 F.2d at 1263 (policy statement not binding on mine operators), or expose them to civil and criminal liability, *cf.* Pierce at § 6:1 at 406 (describing binding effect of legislative rules). Policy statements generally do not require an agency's compliance with their pronouncements to find a violation of a regulation. *Rapp*, 52 F.3d at 1522 (agency had discretion to impose penalty inconsistent with recommendation in policy statement).

b. *Analysis*

The ALJ determined that "testing [for combustible dust] was unnecessary" to find a violation of the designated trucks standard. *Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *17. Jake's argues on appeal that it could not be cited for such a violation

because OSHA did not test for combustible dust and that the Secretary otherwise did not prove a violation. This argument fails because (1) § 1910.178(c)(2)(vii) does not require testing; (2) to the extent the Directive calls for testing, it is not binding on OSHA in finding a violation of the safety standard; and (3) the Secretary marshalled sufficient evidence to prove a violation of § 1910.178(c)(2)(vii).[14]

      i.   <u>Section 1910.178 does not require testing</u>

Section 1910.178(c)(2)(vii) does not contain a combustible dust testing requirement. It has "a plain and unambiguous meaning with regard to the particular dispute in the case," *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1062 (10th Cir. 2014) (quotations omitted), that OSHA was not required to test the dust. The designated truck standard requires only that employers use "industrial trucks designated as DY, EE, or EX" in environments where "deposits or accumulations of such [combustible] dust may be ignited by arcs or sparks originating in the truck." 29 C.F.R. § 1910.178(c)(2)(vii). Neither this provision nor any other part of § 1910.178 requires OSHA to test for combustible dust before issuing a citation. Nor does the standard prevent an ALJ from finding a violation based on evidence other than testing.

---

[14] In their briefs, the parties agree the Directive calls for testing in certain circumstances, but they disagree whether Jake's fits into the Directive's pyrotechnics manufacture exception to testing. We need not and do not resolve this disagreement because we affirm based on the grounds stated in this opinion.

ii. <u>The Combustible Dust Directive is a policy statement and does not bind the agency in establishing a violation of a safety and health standard</u>

Because the Directive is a policy statement and policy statements are not binding on the agency in establishing a violation, OSHA may prove a violation independently of the policy statement. *See Rapp*, 52 F.3d at 1522 (agency had discretion to impose penalty inconsistent with recommendation in policy statement). The Directive did not add a testing requirement to the designated trucks standard—§ 1910.178(c)(2)(vii).

OSHA program directives, including NEPs, are generally statements of policy. *See* Walter B. Connolly & Donald R. Crowell, *Practical Guide to the Occupational Safety and Health Act*, § 3.02 (2011) (recognizing "Program Directives" as advisory materials that are non-legislative); J. Larry Stine et al., *Occupational Safety and Health Law: Compliance and Practice* § 2.6 (2017) (recognizing "OSHA's directives" as policy statements). The Combustible Dust Directive is no exception.

The language of the Directive does not make its provisions binding to establish a safety violation, nor has OSHA applied it in a way that indicates otherwise. *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). Rather, the Directive "merely represents [OSHA's] position with respect to how it will . . . enforce" its safety and health standards. *Syncor Int'l Corp.*, 127 F.3d at 94.

1) The Directive

The Directive announces best practices for OSHA officials and CSHOs. Its statement of "Purpose" provides that "[t]his instruction contains policies and procedures for inspecting workplaces that handle combustible dusts that are likely to cause dust

25

deflagrations, other fires, or explosions." Combustible Dust Directive at 1. Under "Action," it states that "OSHA Regional Administrators and Area Directors must use professional judgment when ensuring that the policies and procedures set forth in this directive are followed." *Id.* at 2. Under "Application," it states that "OSHA compliance personnel must use professional judgment when carrying out the procedures contained in this directive when conducting inspections of the facilities selected under this NEP." *Id.* It further states that "State plan participation in this national emphasis effort is strongly encouraged but is <u>not</u> required." *Id.* at 3.

Under "Inspection and Citation Procedures," the CSHO retains wide latitude. In outlining factors that indicate a potential fire, explosion, or other fire hazard, the Directive states "CSHOs *should* recognize that the following criteria" and "CSHOs *should* be able to recognize the following conditions." *Id.* at 11 (emphases added). *See also, e.g.*, *id.* at 12 ("CSHOs *should* observe areas of the plant for accumulations of hazardous levels of dust.") (emphasis added); *id*. at 13 ("Bulk samples in 1-liter plastic bottles are *preferred*.") (emphasis added); *id*. at 14 ("CSHOs *should* take precautions not to contaminate the sample material.") (emphasis added); *id*. at 15 ("CSHOs *should* also pay attention to the dust collectors and ductwork.") (emphasis added).

The foregoing passages emphasize that the Directive consists of policies and procedures and urge that agency officials use professional judgment in applying them. Nothing in the Directive requires compliance with its provisions to establish a violation of a safety standard. The Directive sets forth procedures that OSHA expects its

26

inspectors to follow, but it does not create additional requirements for the agency to establish a safety standard violation.

We recognize that some of the Directive's language is phrased in mandatory terms. It states that "dust samples *must* be safely collected" if "CSHOs find that there are potential combustible dust hazards." *Id*. at 12 (emphasis added). But although the Directive "on occasion uses mandatory language . . . the document as a whole does not read as a set of rules." *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). As the foregoing discussion shows, the Directive supports our view that it serves as policy guidance and not a set of requirements to establish a violation.

### 2) OSHA's application

OSHA has not applied the Directive in a way to suggest that it prescribes rules to establish a safety violation. As the Secretary explains in his brief, "OSHA's instructions to its personnel on how to inspect for most combustible dust hazards . . . . was simply not relevant to the ALJ's task, which was to evaluate the evidence presented to determine whether combustible dust accumulations were present when Jake's Fireworks used a[] LP forklift in the fireworks storage container." Aplee. Br. at 47. Consistent with this statement, OSHA has previously characterized the Directive as non-binding guidance. In *American Phoenix Inc.*, a proceeding before an OSHRC ALJ, the Secretary characterized the Directive as "simply provid[ing] guidance to OSHA Area Offices" as opposed to a legislative rule promulgated through notice and comment rulemaking. *Am. Phoenix, Inc.*, 24 BNA OSHC ¶ 2228, at *6 (No. 11-2969, 2014) (ALJ). Further, in *National Oilseed Processors Ass'n v. OSHA*, 769 F.3d 1173 (D.C. Cir. 2014), the agency characterized the

27

Directive as "guidance on the nature and definition of combustible dust in a variety of materials," *id.* at 1177. The OSHRC ALJ in *American Phoenix* and the D.C. Circuit in *National Oilseed* did not dispute this characterization, and neither do we. *See Am. Phoenix, Inc.*, 24 BNA OSHC ¶ 2228, at \*8 (agreeing that the Directive "merely provides inspection guidance regarding combustible dust hazards"); *Nat'l Oilseed Processors Ass'n*, 769 F.3d at 1177-78.

The Directive is "an agency position with respect to how it will . . . typically enforce [] the governing legal norm," including the designated trucks standard in § 1910.178(c)(2)(vii). *Syncor Int'l Corp.*, 127 F.3d at 94. Because the Directive is a policy statement, OSHA was not required to test the dust to establish a violation.[15]

---

[15] We note our analysis of whether the Directive constitutes a policy statement is consistent with *Wilderness Society*, 434 F.3d 584. The D.C. Circuit is "guided by two lines of inquiry" in "determining whether an agency has issued a binding norm or merely a statement of policy":

> One line of analysis focuses on the effects of the agency action, asking whether the agency has (1) imposed any rights and obligations, or (2) genuinely left the agency and its decisionmakers free to exercise discretion. The language actually used by the agency is often central to making such determinations. The second line of analysis focuses on the agency's expressed intentions. The analysis under this line of cases looks to three factors: (1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency.

*Id.* at 595 (quotations, citations, and brackets omitted).

28

### iii. The Secretary proved a violation of § 1910.178(c)(2)(vii)

Jake's argues that, "[w]ithout sufficient evidence obtained under the procedures required by the Directive, there can be no violation." Aplt. Br. at 18. Because we have determined that the Directive is not binding on OSHA to establish a violation, this argument fails on its own terms.[16] To the extent, however, Jake's is making a broader argument that the Secretary failed to show that Jake's used an unauthorized forklift in proximity to combustible dust, that argument, under the substantial evidence standard of review, also fails.[17]

---

[16] We note that even if the Directive were binding to prove a violation, CSHO Hodge's not testing the dust may nonetheless have been consistent with the Directive. The Directive calls for CSHOs to collect samples only if "[they] find that there are *potential* combustible dust hazards." Combustible Dust Directive at 12 (emphasis added). The evidence presented to the ALJ comports with CSHO Hodge's having determined that a combustible dust hazard—as opposed to a *potential* dust hazard—existed. He responded to a "fire or explosion" at a fireworks warehouse, ROA at 201; knew that the containers stored fireworks, *id.* at 210; inspected the burned storage container, *id.* at 218; and observed crushed fireworks, debris in piles, and broken fireworks on the loading dock, *id.* at 223, 245, 248-49.

[17] This argument addresses the second element of the four-part test to prove a violation. Jake's also seems to challenge the fourth element on appeal, arguing the Secretary failed to demonstrate the employer's actual or constructive knowledge of the violation. Aplt. Br. at 18 (arguing Jake's "could not know of a violative condition that did not exist"). It argues that it "had good reason to believe that the forklifts it was using would not ignite combustible dust." *Id.* at 19. Jake's two sentences on the fourth element may "fail to frame and develop an issue sufficient to invoke appellate review." *Kelley v. City of Albuquerque*, 542 F.3d 802, 819 (10th Cir. 2008) (alteration and quotations omitted). But even considering the argument, Jake's again misconstrues the fourth element. "[T]he Secretary need not show that an employer understood or acknowledged that the physical conditions were actually hazardous." *Boh Bros. Constr. Co., LLC*, 24 BNA OSHC ¶ 1067, at *8 (quotations omitted). Instead, he must show only that the employer knew "the physical conditions that constitute a violation" existed. *Id.* (quotations omitted).

Substantial evidence supports the ALJ's conclusion that Jake's employees operated the forklift around the combustible dust. The ALJ relied on the following evidence regarding the existence of combustible dust in the Old Facility:

> (1) The MSDS describing the fireworks as "a solid mixture of oxidizer and fuel that will burn if ignited."[18]
>
> (2) The warning labels on the fireworks' packaging stating they "shoot[] flaming balls."
>
> (3) Mr. Harper's testimony that he saw the contents of fireworks spilled onto the floor of the container.
>
> (4) Fire Investigator Tippie's testimony that he observed combustible pyrotechnic material on the floor.

*Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *17-18. The record also includes CSHO Hodge's testimony regarding his inspection of the burned storage container and his observation of crushed fireworks on the ground. ROA at 218, 222.

"[A] reasonable mind would consider" this evidence as "adequate to support [the ALJ's] conclusion" that the dust was combustible. *Universal Constr. Co.*, 182 F.3d at 732 (quotations omitted). Because the parties do not dispute that Jake's used a LP forklift—which is not a designated truck under §1910.178(c)(2)(vii)—the ALJ properly concluded that Jake's violated the standard.

_____

[18] Jake's argues that, under the Directive, the ALJ erred in considering its MSDS as evidence that its fireworks were combustible. *See* Aplt. Br. at 17. But, as previously explained, the Directive is not binding to find a violation. Even if it were, the Directive does not prohibit the use of the MSDS as evidence of combustible dust. Rather, it tells CSHOs not to "use MSDSs as a sole source of information" because "information [about a substance's combustibility] is often excluded from MSDSs." Combustible Dust Directive at 12. CSHOs may thus use MSDSs as evidence of a substance's combustibility to supplement other evidence.

Under the substantial evidence standard, we affirm the ALJ's determination that Jake's violated §1910.178(c)(2)(vii).

3. **Section 1910.1200(e)(1) - Hazard Communication Program Violation**

The ALJ determined that the Secretary met his burden to prove that Jake's lacked a written hazard communication program and therefore violated § 1910.1200(e)(1). The ALJ further concluded that under the first element of the four-part test—whether the standard applied—Jake's was not exempt. Jake's argues the first element was not met and the ALJ erred because it handles "articles" and therefore is exempt from needing to have a hazardous communication program. We disagree and affirm the ALJ's ruling.

a. *Additional legal background*

Title 29 C.F.R. § 1910.1200(b)(6)(v) exempts employers that handle "articles" from having a hazardous communications program. An article "means a manufactured item other than a fluid or particle:

> (i) which is formed to a specific shape or design during manufacture;
>
> (ii) which has end use function(s) dependent in whole or in part upon its shape or design during end use; and
>
> (iii) which under normal conditions of <u>use</u> does not release more than very small quantities, e.g., minute or trace amounts of a hazardous chemical (as determined under paragraph (d) of this section), and does not pose a <u>physical hazard</u> or health risk to employees."

29 C.F.R. § 1910.1200(c) (emphases and paragraph breaks added).

Jake's argument that it is exempt from the standard under the third provision turns on the two key phrases underlined above and which are defined in § 1910.1200(c). First,

31

"use" means "to package, handle, react, emit, extract, generate as a byproduct, or transfer." *Id.* Second, a "physical hazard" is "a chemical that is classified as posing one of the following hazardous effects: explosive; flammable (gases, aerosols, liquids, or solids) . . . ." *Id.*

b. *Analysis*

Jake's is not exempt because it does not import and distribute "articles" as defined in 29 C.F.R. § 1910.1200(b)(6)(v). The ALJ determined that fireworks "pose a physical hazard" and therefore do not qualify as "articles." *Jake's Fireworks, Inc.*, 26 BNA OSHC ¶ 1738, at *21. We agree.

The parties agree that Jake's imported, stored, and distributed 1.4G explosives at the Old Facility. This "use" posed a "physical hazard" because 1.4G fireworks are both "explosive" and "flammable." The record before the ALJ contained ample evidence of these "hazardous effects." For example, Fire Investigator Tippie testified that the 1.4G fireworks were combustible, ROA at 114, and the fireworks label warned that they "shoot[] flaming balls," *id.* at 654. Because the importation, storage, and distribution of fireworks pose a "physical hazard," 1.4G fireworks do not qualify as articles. Section 1910.1200(e)(1) therefore applies to Jake's.

Jake's argues that "under normal conditions," 1.4G consumer fireworks do not pose a physical hazard, and therefore the article exemption applies. "Normal conditions," Jake's contends, involve "a consumer setting off fireworks and enjoying the sights and sounds," which does not expose users to "an inherently hazardous product." Aplt. Br. at 32. But Jake's ignores the definition of "use" in 29 C.F.R. § 1910.1200(c). "Use" means

32

"to package, handle, react, emit, extract, generate as a byproduct, or transfer," 29 C.F.R. § 1910.1200(c), which refers to uses at the worksite, not use by consumers. Indeed, Jake's position fails to recognize that the OSHA standards are designed to protect employees in the workplace.

We affirm the ALJ's finding that Jake's was not exempt under 29 C.F.R. § 1910.1200(b)(6)(v) and that § 1910.1200(e)(1) applied.

## III. CONCLUSION

The ALJ properly determined Jake's violated the three OSHA safety and health standards. First, § 1910.109(b)(1) is not unconstitutionally vague as applied to this case. Moreover, the Secretary presented sufficient evidence for the ALJ to determine that Jake's violated the standard and had actual and constructive knowledge that the Old Facility's conditions constituted an undue hazard to life. Second, § 1910.178(c)(2)(vii) does not contain a combustible dust testing requirement, the Combustible Dust Directive is not binding on the agency in proving a § 1910.178(c)(2)(vii) violation, and the Secretary presented sufficient evidence for the ALJ to conclude that Jake's used an unauthorized forklift in proximity to combustible dust at the Old Facility. Third, § 1910.1200(e)(1) applies because Jake's does not handle "articles" under 29 C.F.R. § 1910.1200(b)(6)(v).

For the foregoing reasons, we affirm the issuance of the citation and deny the petition to review.

33